UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATICHA MCCLAIN,

                Plaintiff,                Civil Action No. 2:10-cv-11141

      v.                        District Judge Gerald E. Rosen
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [21, 25]**

       Plaintiff Naticha McClain ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 21, 25), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 10, 24).

## I. RECOMMENDATION

       For the reasons set forth below, this Court finds that the administrative record requires further development as to the severity of Plaintiff's bipolar disorder; specifically, whether an explanation exists that negates the adverse inference the ALJ used in discounting Plaintiff's assertions of a disabling mental impairment. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

Plaintiff alleges disability since March 1, 1990 and applied for SSI on October 25, 2007. (Tr. 109.) The Commissioner denied Plaintiff's disability application on March 14, 2008. (Tr. 53.) She then filed a request for a hearing. On June 19, 2009, Administrative Law Judge ("ALJ") Robert Senander held an initial hearing to inform Plaintiff of her right to legal counsel. (Tr. 45-52.) On September 16, 2009, Plaintiff, unrepresented, appeared via video conference before the ALJ who considered the case *de novo*. (Tr. 10, 18-42.) In a September 25, 2009 decision, the ALJ found that Plaintiff had not been disabled since October 25, 2007 (her SSI application date). (Tr. 10-17.) That decision became the final decision of the Commissioner on January 22, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on March 22, 2010. (Dkt. 1.)

### B. Background

Plaintiff was 34 years old at the time of the administrative hearing and the ALJ's disability determination. (Tr. 10, 109.) Although Plaintiff attended some special education classes, she completed the 10th grade, and has made some efforts to obtain a GED and a certificate to work as a hairdresser. (Tr. 23, 130.) From June 2000 to February 2001, Plaintiff worked as a recreation aide for the City of Detroit. (Tr. 37-38, 124.) That job involved inventorying children's activities and putting those activities away after use. (*Id.*) Plaintiff states she was "let go because [she was] homeless [and] kept being late." (Tr. 164.) It appears Plaintiff has not engaged in any significant employment before or since. (Tr. 37-38.)

Plaintiff had a difficult childhood. She reported being sexually abused by her stepfather at

2

age 12 (which her mother did not believe), and was placed in foster care. (Tr. 207, 261.) At age 13, Plaintiff was diagnosed with a learning disability. (Tr. 261.) At age 16, she returned home but her mother allowed her stepfather to move back in the very day she reunited with her mother. (Tr. 261, 309.) Plaintiff ran away from home soon thereafter, and a psychiatric report states that "[w]hile on the streets she became involved with other men while 'looking for love in all the wrong places.'" (Tr. 261.) She was pregnant at age 17, and a contemporaneous Department of School Social Work Services Treatment Summary provides that Plaintiff had sporadic school attendance, mostly failing grades, and "continues to be beset by many emotional problems." (Tr. 200.)

Plaintiff has nine children all of whom are (or were at one time) in the custody of the state. (*See* Tr. 27, 252, 261, 307.) She lost custody of her oldest when the child was two years old. (Tr. 261.) According to Plaintiff, the paternal grandmother of her oldest child wanted custody, Plaintiff, depressed, may have been neglectful, and when Plaintiff left the child with the grandmother for a few days, the grandmother reported abandonment to Child Protective Services ("CPS"). (Tr. 261, 275, 307.)[1] She gave up her second oldest at nine months, and had custody over her third child for only a year. (Tr. 275.) An undated court document regarding her fifth child provides that Plaintiff was not in compliance with required counseling and parenting classes, and she did not have heat or electrical service at her residence. (Tr. 191.) According to Plaintiff her children were taken on grounds of neglect, but Plaintiff has denied neglecting them. She claims the state took them because she was "in the system." (Tr. 261.) In September 2007, Plaintiff reported that she was "transitioning" to having her children returned to her, and had custody of them on

---

[1]As noted below, at the hearing before the ALJ, Plaintiff testified that it was her sister that called CPS.

weekends, but there was an incident where one child hit another and the court attributed the incident to Plaintiff's neglect. (Tr. 251, 261.) An October 2007 state-court order provides that Plaintiff's housing lacked heat, she had other children outside her care, and she was seeing a therapist twice a month and taking medication. (Tr. 252.) The order placed her then-newborn (seventh) child with the Department of Human Services. (Tr. 252.) A few weeks before the September 2009 hearing before the ALJ, Plaintiff gave birth to twin girls who were taken out of her care "right from the hospital." (Tr. 22-27.)

### 1. *Plaintiff's Testimony*

At the hearing before the ALJ, Plaintiff testified that bipolar disorder, anxiety, feeling overwhelmed, and an inability to concentrate prevented her from working. (Tr. 24-25.) According to Plaintiff, her bipolar disorder caused her to work fewer hours, become homeless, and "rage or lash out at people." (Tr. 123.) She attested that her mental state prevented her from "deal[ing] with" her job as a recreational aide for the City of Detroit. (Tr. 34.) Plaintiff admitted, however, that she was not on medication for her disorder at that time. (Tr. 34.) At the time of the hearing, Plaintiff was taking Pristiq and Topomax for her bipolar disorder which made her "feel really sleepy and drugged, drowsy." (Tr. 29-20.)

Plaintiff also explained that CPS took her children because of her bipolar disorder. (Tr. 27.) The ALJ responded that children are not taken for bipolar disorder alone, and pressed Plaintiff to explain the circumstances surrounding the loss of custody over her children. (Tr. 27, 35.) Regarding her oldest child, Plaintiff explained that she was experiencing postpartum depression and "suicidal tendenc[ies]" which prompted her sister to call CPS. (Tr. 28, 35.) "[W]hen I was crying out to my family for help[,] instead of helping me they called [Child] Protective Service[s] on me."

4

(Tr. 28.)

Regarding her typical day, Plaintiff testified that she wakes around 7:00 a.m. and goes to bed around 9:00 p.m. (Tr. 30.) She attends parenting classes as required by her parent agency agreement, spends time with her children, and makes sure she attends her medication appointments. (Tr. 31.) Plaintiff attested that the parenting class, which was working "really well" for her, had four or five women, and went for two hours without a break. (Tr. 32-33.) On her disability application, however, Plaintiff provided that she daydreams, sits in the dark thinking about her kids, and takes naps during the day. (Tr. 136.) The application further provides that she makes sandwiches and frozen dinners, sometimes does laundry, ironing, and cleaning. (Tr. 138.) Plaintiff stated that she attends church "every Sunday" but that her cousin or mom takes her there. (Tr. 140.)

### 2. Medical Evidence

In a psychiatric evaluation, Plaintiff reported that as an infant, she either fell out of bed or her father threw her across a room resulting in 30 sutures to her head. (Tr. 276.)

In August 1996, Plaintiff, then 21 years old, spent five days at Michigan Hospital and Medical Center for depression. (Tr. 206-26.) Plaintiff was "petitioned" to the hospital by a social worker because she "was threatening suicide by pills or whatever she could get." (Tr. 207.) At intake, she was diagnosed with depression and assigned a GAF score of 40. (Tr. 207.)[2] Her thought

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter *DSM-IV*), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF of 31 to 40 reflects "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger

process was logical, and no delusions were noted. (Tr. 208.) Her recent and remote memory were intact, but her thinking process was slow. (Tr. 208.) Upon discharge, the hospital gave Plaintiff goals of identifying stressors and coping mechanisms, prescribed Prozac, assigned a GAF score of 60,[3] and referred her to New Center Community Mental Health Services ("New Center Health") for psychiatric treatment. (Tr. 207, 209.)

In June 1997, Plaintiff took herself to the hospital because of severe depression. (Tr. 268.) Her diagnosis was Bipolar I Disorder, Most Recent Episode Mixed, Moderate. (Tr. 268.) In 1998, Plaintiff again went to the hospital for depression. (Tr. 276.) She had suicidal ideation but no attempt. (Tr. 276.)

In July 2002, a social worker referred Plaintiff to Stephanie Sethi, RN, MS, CS, NP, for a psychiatric evaluation. (Tr. 275-80.) Plaintiff, then 27 years old, had two months prior given birth to her fourth child, and complained of depression and feeling overwhelmed and guilty about having the baby. (Tr. 275.) While she admitted to thoughts of harming or abandoning the baby when the baby was crying and could not be quieted, Plaintiff did not believe that she would act on her thoughts. (Tr. 275.) Plaintiff had been prescribed Zoloft, but did not take it due to her pregnancy. (Tr. 275.) Upon examination, Ms. Sethi found that Plaintiff was nicely groomed, had motor activity within normal limits, had no delusional phenomena, appeared to have intelligence within normal limits, and could recall 3/3 objects immediately and 2/3 after two minutes. (Tr. 278.) Her insight and judgment were fair. (Tr. 278.) Ms. Sethi diagnosed Plaintiff with Major Depressive Disorder,

---

children, is defiant at home, and is failing at school)." *Id.* at 34.

[3] A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

Recurrent and assigned a GAF of 55.  (Tr. 279.)  Plaintiff's prognosis was "[f]air if compliant with treatment."  (Tr. 280.)

On October 24, 2005, Plaintiff called New Center Health "requesting [outpatient] mental health [treatment] as ordered by CPS."  (Tr. 267.)  Just three months prior she had her fifth child.  (Tr. 267.)  Plaintiff reported no current symptoms and no treatment for the past two years.  (Tr. 267.)  Lisa Tye MSW, CSW diagnosed Plaintiff with Bipolar I Disorder, Most Recent Episode Mixed, Moderate.  (Tr. 268.)  Plaintiff subsequently missed her intake appointment, however, and did not respond to a follow up from New Center Health.  (Tr. 270.)  Accordingly, New Center Health closed Plaintiff's case in February 2006.  (Tr. 270.)

On October 27, 2005, Plaintiff attempted treatment at Northeast Guidance Center.  (Tr. 242.)  Social worker Patricia Quayle noted that Plaintiff's mood was dysthymic,[4] her affect anxious, and her grooming, hygiene, and speech were within normal limits.  (Tr. 242.)  Ms. Quayle's notes also provide that a psychiatric evaluation was scheduled because of Plaintiff's "urgency [in] getting an evaluation for [CPS] so that they will end the current [CPS] investigation of her care of her infant."  (Tr. 242.)  Similar to the attempted treatment at New Center Health, however, Plaintiff missed November 2005, December 2005, and January 2006 appointments with the Northeast Guidance Center.  (Tr. 239-41.)  She attended her February 2006 appointment, but it appears not much was accomplished as her social worker "was out on an emergency and the [appointment] began late."  (Tr. 237.)  In May 2007, Northeast Guidance Center terminated services because Plaintiff was

---

[4]*Stedman's Medical Dictionary* (27th ed. 2000) (defining "dysthymia" as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.").

noncompliant with treatment and/or failed to contact the agency for a period of 90 days.  (Tr. 232.)

On September 6, 2007, Plaintiff, then 32 years old, presented at the University Psychiatric Centers/PBMP with symptoms of depression, crying spells, and guilt.  (Tr. 260.)  Plaintiff had recently given birth to her seventh child, and was two months postpartum at the time of her assessment.  (Tr. 260.)  Plaintiff informed Drs. Richard Balon and Kanwaldeep Sidhu that she had an upcoming court date regarding child custody, and "admitted that part of her reasoning of getting help now is to show the court that she is working toward improving her mental health."  (Tr. 261.) Regarding her medical history, she reported that in 2000 she "went without sleep for about a week, wandered in [the] streets at night, [and] felt that [the] devil was on her mind," and that in 2004 she had similar episodes.  (Tr. 260.)  Upon evaluation, the doctors found that Plaintiff was well-groomed, her short-term and long-term memory were "intact," her behavior and affect were "appropriate," her thought "logical," intelligence "average," but that her judgment was "poor." (Tr. 262.)  The doctors noted that her current GAF was 60, past year's high, 75, and past year's low, 60.  (Tr. 262.)  They diagnosed her with Bipolar I Disorder, Most Recent Episode Depressed, Mild. (Tr. 262.)  The physicians concluded that Plaintiff would "benefit from medication and supportive psychotherapy, focusing on coping skills and psychoeducation."  (Tr. 262.)  Plaintiff subsequently had several "no call no shows" with Dr. Sidhu, however, and despite Dr. Sidhu's year-long encouragement for her to see a therapist, Plaintiff failed to act on Dr. Sidhu's referrals.  (Tr. 311.) It appears that Plaintiff visited Dr. Sidhu only when her medication needed refilling.  (Tr. 311.)

On February 23, 2008, Dr. R. Hasan, a psychiatrist, examined Plaintiff and reviewed her medical records on behalf of the State Disability Determination Services ("DDS").  (Tr. 285.) Plaintiff recounted her childhood history, and also stated that she heard "God's voice which is good

8

and the devil's voice which is bad." (Tr. 285.) She reported that her then seven children were living with their aunt. (Tr. 285.) Plaintiff also told Dr. Hasan that one minute she is happy and on top of the world but the next she feels sad and depressed. (Tr. 287.) Dr. Hasan noted that Plaintiff went to church, did light chores and cooking, watched TV, and read the Bible. (Tr. 286.) She had contact with reality, but her self esteem was low. (Tr. 286.) Plaintiff was able to repeat four numbers forward and three backward, but was only able to recall one of three objects after three minutes. (Tr. 286.) Regarding abstract thinking, she did not understand the proverb "the grass is greener on the other side." (Tr. 287.) Regarding judgment, she said that if she found a stamped, addressed envelope, she would take it home. (Tr. 287.) Dr. Hasan diagnosed Plaintiff with Bipolar I Disorder, Mixed Type, with psychotic features and post traumatic stress disorder. (Tr. 287.) Dr. Hasan assigned Plaintiff a GAF score of 45, and gave her a prognosis of "fair to guarded." (Tr. 287.)

On March 14, 2008, Dr. Zahra Yousuf completed a Psychiatric Review Technique ("PRT") form and a Mental Residual Functional Capacity ("MRFC") form on behalf the State DDS. (Tr. 288-305.) Dr. Yousuf diagnosed Plaintiff with bipolar syndrome with a history of episodic periods, and, regarding the "B criteria" of the Listings, found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in both social functioning and concentration, persistence, and pace, and no episodes of decompensation of extended duration. (Tr. 298.) The MRFC form also provides that Plaintiff had moderate limitations in the ability to (1) understand, remember, and/or carry out detailed instructions, (2) maintain concentration for extended periods, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms, (4) interact appropriately with the general public, and (5) set realistic goals or make plans independently of others. (Tr. 303.) Dr. Yousuf nonetheless concluded, that the "evidence in [the

9

claimant's] file indicates that the claimant retains the mental capacity to understand, remember, maintain concentration [and] pace, get along with others, [and] respond to change in order to complete simple unskilled tasks on a sustained basis." (Tr. 304.)

On September 22, 2008, Plaintiff began treatment anew at the Northeast Guidance Center. (Tr. 361.) Andrea Lavigne, LMSW, noted that Plaintiff "appeared tearful, irritable, with mood swings," but was "cooperative." (Tr. 361.) Ms. Lavigne noted Plaintiff's good judgment in seeking treatment, diagnosed Plaintiff with Bipolar I Disorder, Most Recent Episode Mixed, Mild, and assigned Plaintiff a GAF score of 60. (Tr. 361.)

On December 23, 2008, Elva Anderson, LBSW, at the Northeast Guidance Center noted that Plaintiff "reports medication compliance. She reports decrease[] in episodes of agitation, mood swings, and crying spells. She reports increased socialization and involvement with church members/activities." (Tr. 365.) Under her treatment plan, Plaintiff was to meet with a physician once every 90 days for medication review, and was to see a therapist at least once monthly for a minimum of six months. (Tr. 365.) However, a subsequent Northeast Guidance Center report provides that from November 2008 to April 2009 Plaintiff missed eight appointments with her therapist or physician. In June 2009, the Northeast Guidance Center closed Plaintiff's case because she had failed to keep her scheduled appointments and was "non-compliant with all aspects of her treatment." (Tr. 360.)

In January 2009, Plaintiff presented at the Detroit Medical Center and University Health Center Emergency Psychiatric Department with anxiousness, depression, feeling overwhelmed, and "suicidal thoughts [at] times with no plan." (Tr. 330.) She was two months pregnant at the time and had been instructed to stop her medication because of the pregnancy. (Tr. 330, 349.) The

10

emergency physician diagnosed Plaintiff with depression, not otherwise specified, anxiety, not otherwise specified, and assigned Plaintiff a GAF of 65. (Tr. 346.) The emergency physician did not believe Plaintiff's mental state required her to be transferred for psychiatric treatment, however, instead concluding that Plaintiff was capable of walking herself over to Detroit Receiving Hospital's crisis center for treatment. (Tr. 352-53.)

The record also contains records from the Juvenile Assessment Center for Wayne County. (Tr. 306-318.) Renee Harris, M.D., performed a psychiatric evaluation of Plaintiff in February 2009. (Tr. 307.) There, Plaintiff expressed her belief that her sister "wants to keep her children in order to continue to receive financial compensation for their care." (Tr. 308.) Dr. Harris noted that Plaintiff "has been symptomatically stable and has not been hospitalized within the past 10 years." (Tr. 308.) Upon evaluation, Plaintiff appeared well nourished with good grooming and hygiene, had "age appropriate motoric behavior," her affect was "bright and reactive," and her "memory is intact to immediate, recent and remote testing." (Tr. 309.) Her intelligence was estimated to be in the "Average" range, and "[h]er insight and judgment [were] fair." (Tr. 309.) Testing "suggest[ed] limited social judgment and reasoning skills," however. (Tr. 310.) Dr. Harris diagnosed Plaintiff with bipolar disorder (not otherwise specified) and assigned Plaintiff a GAF score of 65. (Tr. 309.) Dr. Harris's report concludes:

> [Plaintiff] needs to maintain compliance with her parent agency agreement in order for reunification efforts to continue. In order to be compliant, she needs to obtain employment, secure housing and complete her GED requirements. She reports being compliant with her psychiatric appointments and psychotropic medication regiment. That being the case, there is no reason at this time for reunification efforts to be suspended.

(Tr. 310.)

11

The record includes part of an undated and unsigned report (apparently prepared by the Juvenile Assessment Center in early 2009) which provides that Plaintiff's "mental health reports are replete with non-compliance with medication." (Tr. 311.) The partial report continues:

> The mental health reports . . . state that when [Plaintiff] was in compliance with medication and appointments, [she] was reported to have established a household and was motivated to complete her education and acquire job skills and employment. However[,] the reporting clinician by case closure stated there was little evidence that these were acted upon with any diligence.

(Tr. 311.) According to the partial report, a clinician found that while the voices of God and demonic spirits Plaintiff heard were in part attributable to Pentecostal culture, "possibly psychosis is also commingled into this belief and creating further pathology that exceeds church practices and faith." (Tr. 311.)

In April 2009, the Juvenile Assessment Center prepared a court report stating that Plaintiff "has [been] very diligent in her attendance to Ennis Center for Children [for therapeutic counseling] and has made great progress on her treatment goals." (Tr. 313.) The report further provided that Plaintiff had attended ten 45-minute sessions between February and April 2009. (Tr. 313.) The report indicated a court hearing date of May 4, 2009. (Tr. 313.)

### 3. Non-Medical Evidence

Plaintiff's cousin, Wanda Whetstone, completed a Function Report on behalf of Plaintiff. (Tr. 148.) Ms. Whetstone stated that Plaintiff lived alone in a house; swept, ironed, and mopped; and volunteered at her church. (Tr. 148.) She stated that Plaintiff "can't keep a conversation on the same subject," however, and indicated that Plaintiff did not finish what she started. (Tr. 153.)

12

### 4. Vocational Expert's Testimony

The ALJ asked Vocational Expert, Richard Szydlowski, to consider a hypothetical individual limited to performing a "one, two, or three-step job" with "incidental contact [with the] general public." (Tr. 40.) When the VE asked for clarification on the latter limitation, the ALJ explained "[a] function is performed but you don't really talk. You don't have a lot of interaction." (Tr. 40.) The ALJ gave an example of a movie ticket taker (as opposed to ticket seller). (Tr. 40.) The VE testified that such a person would be able to work as a packer, cleaner, and kitchen helper. (Tr. 40-41.) The VE further attested that there were packer, cleaner, and kitchen helper jobs in southeastern Michigan in both the medium and light exertional work categories. (Tr. 41.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits

13

are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since October 25, 2007—Plaintiff's disability application date. (Tr. 12.) At step two, the ALJ found that Plaintiff had the severe impairment of bipolar disorder. (Tr. 12.) Next, the ALJ concluded that Plaintiff's bipolar disorder did not meet or medically equal a listed impairment. (Tr. 12-13.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with nonexertional limitations stemming from her mental impairment that limit her to jobs involving one, two, and three step tasks and involve only incidental contact with the general public." (Tr. 13.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 16.) At step five, the ALJ found that Plaintiff's "ability to

14

perform work at all exertional levels has been only slightly compromised by nonexertional limitations," and that given her RFC Plaintiff could perform work that exists in significant numbers in the national economy.  (Tr. 16-17.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

15

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

### F. Analysis

#### 1. Substantial Evidence Supports the ALJ's Finding that Plaintiff's Mental Impairment Did Not Meet or Medically Equal a Listed Impairment

Plaintiff asserts that the ALJ erred in concluding that Plaintiff's mental impairment did not meet or medically equal a listed impairment. (Tr. 12-13.) As relevant here, Listing 12.04 provides: "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. In turn, the "B" criteria are met by a showing of at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of

16

decompensation, each of extended duration.  *Id.*  Regarding the B criteria, the ALJ found that

> the claimant's mental impairment imposes mild restrictions in
> activities of daily living, moderate limitations in social functioning
> and in her ability to maintain concentration, persistence, and pace,
> and she has had no episode of decompensation of extended duration.

(Tr. 13.)  Plaintiff claims that substantial evidence does not support these B criteria findings, and

that the record evidence instead requires a finding that Plaintiff has marked limitations in activities

of daily living and maintaining social functioning, and that Plaintiff has had repeated, extended

episodes of decompensation.  (*See* Pl.'s Mot. Summ. J. at 15-16.)  Given the present record, the

Court disagrees.

Regarding activities of daily living,[5] Plaintiff asserts that the Function Report she completed

in November 2007 supports a "marked" limitation in that functional category.  Plaintiff's self-

completed application  states that Plaintiff "starts wandering around" and "forgets" when cooking,

that she sits in the dark thinking of her children and her illness, that she sometimes needs reminders

about doing the laundry, and that she sometimes starts tasks without finishing them.  (*See* Tr. 136-

38; Pl.'s Mot. Summ. J. at 16.)  The appropriate inquiry, however, is whether, upon viewing the

record as a whole, substantial evidence supports the ALJ's finding that Plaintiff does *not* suffer from

that level of limitation.  The Court finds that such evidence exists.

Most critically, Dr. Yousuf, a psychologist acting on behalf of the State DDS, opined that

Plaintiff was only mildly restricted in her activities of daily living.  (Tr. 298.)  No other physician

rated Plaintiff's B criteria.  Dr. Hasan, who assigned Plaintiff her lowest GAF score, noted that

---

[5]Activities of daily living "include adaptive activities such as cleaning, shopping, cooking,
taking public transportation, paying bills, maintaining a residence, caring appropriately for your
grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404,
subpt. P, app. 1, § 12.00(C)(1).

Plaintiff went to church, did light chores and cooking, watched TV, and read the Bible. (Tr. 286.) The Function Report that Plaintiff now relies upon itself provides that Plaintiff makes sandwiches, sometimes does laundry, irons, cleans, and takes public transportation. (Tr. 138.) In several psychiatric evaluations, different physicians noted that Plaintiff's grooming and hygiene were "good" or "within normal limits." (Tr. 242, 262, 309.) Viewing the present record as a whole, substantial evidence exists to support the ALJ's finding that Plaintiff is mildly limited in activities of daily living, or, at a minimum, that Plaintiff does not have a "marked" limitation in this category.

Regarding Plaintiff's ability to maintain social functioning,[6] substantial evidence also supports the ALJ's determination that Plaintiff has a "moderate" limitation in this category. Plaintiff again points to her self-completed Function Report which provides that she does not like to go out or for people to see her. (Tr. 139.) That report also states that her family thinks she is crazy, and that Plaintiff does not bother herself with social activities because people think she is crazy and she gets out of control. (Tr. 141.) Plaintiff also cites Dr. Hasan's notes which provide that Plaintiff has "no close friends," and "does not get along well with others." (Tr. 286.) Finally, Plaintiff relies on a Function Report completed by her cousin, Ms. Whetstone, which states that Plaintiff thinks people talk about her, and that she does not go out often. (Tr. 151.)

On the other side of the scale, however, Plaintiff testified that she attends parenting classes (Tr. 31; *see also* Tr. 313), she attends church regularly (Tr. 140), and she volunteers at her church (Tr. 148, 309). Dr. Hasan's February 2008 notes also provide that Plaintiff lives with a church

---

[6]Social functioning involves a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(2).

member.  (Tr. 286.)  Ms. Whetstone also noted that she and Plaintiff visited regularly.  (Tr. 152.)
Moreover, Dr. Yousuf (again, the only physician to rate Plaintiff's B criteria) found that Plaintiff
had a moderate limitation in social functioning.  (Tr. 298.)   On balance, while there may be
substantial evidence to support a finding that Plaintiff has marked limitations in social functioning,
substantial evidence also supports the ALJ's moderate limitation.

Finally, Plaintiff argues that she has had "repeated episodes of decompensation of extended
duration."  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B)(4).  Plaintiff points to a hospitalization
in August 1996, another sometime in 1998, and a third in January 2009.  (Pl.'s Mot. Summ. J. at 17.)
The Court notes a fourth hospitalization in June 1997.  (Tr. 268.)  These hospitalizations do not meet
the frequency criteria set forth in the relevant Listing.  Listing 12.00 provides:

> The term *repeated episodes of decompensation, each of extended
> duration* in these listings means three episodes within 1 year, or an
> average of once every 4 months, each lasting for at least 2 weeks. If
> you have experienced more frequent episodes of shorter duration or
> less frequent episodes of longer duration, we must use judgment to
> determine if the duration and functional effects of the episodes are of
> equal severity and may be used to substitute for the listed finding in
> a determination of equivalence.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4).  Plaintiff's hospitalizations were less frequent than
one every four months or three episodes within a year.  *See id.*  Further, the 1996 hospitalization was
for five days, the 1997 hospitalization was for a day, the length of the 1998 hospitalization is
unknown, and the January 2009 hospitalization was for a day.  (Tr. 206-07, 268, 276, 327-50.)
Accordingly, the cited episodes of decompensation do not meet the Listing definition.

Given the forgoing, substantial evidence in the present record supports the ALJ's conclusion
that Plaintiff's bipolar disorder did not meet or medically equal a listed impairment, and,
accordingly, the Court finds that the ALJ did not err at step three.

19

     *2.  The ALJ Erred in Discounting Plaintiff's Testimony Based On Her Inconsistent Mental-Health Treatment by Failing to Determine Whether Plaintiff Has a Good Explanation for Missing Treatments*

In determining Plaintiff's residual functional capacity ("RFC") between steps four and five, the ALJ discounted the weight of Plaintiff's statements.  (Tr. 14.)  In particular, he found that "the claimant's medically-determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" an RFC assessment limiting Plaintiff to "one, two, or three step tasks" involving only "incidental contact with the general public."  (Tr. 13-14.)  Plaintiff asserts that the ALJ reached this conclusion in error because he inappropriately drew an adverse inference from Plaintiff's non-compliance with her mental-health treatment.  (Pl.'s Mot. Summ. J. at 17-18.)  In particular, Plaintiff asserts that the following statement from the ALJ indicates a fundamental misunderstanding of the severity of Plaintiff's bipolar condition:

> [C]laimant has been blatantly noncompliant with mental health treatment, and her motivation consistently appears to be predicated upon the appearance (to the [custody] Court) that she is seeking treatment rather than a genuine attempt to seek and maintain the treatment that would ameliorate her symptoms and restore her ability to work.

(Tr. 14.)  In short, Plaintiff's credibility argument is that "[t]he ALJ failed to recognize that a mentally ill person's noncompliance with treatment can be the result of the mental impairment itself, and, therefore, not willful."  (Pl.'s Mot. Summ. J. at 18.)

The Commissioner  argues that there is substantial evidence to support the ALJ's adverse inference.  (Def.'s Mot. Summ. J. at 16-17.)  In late October 2005, Plaintiff sought treatment at the Northeast Guidance Center and the accompanying notes provide that the therapist scheduled a

20

psychiatric evaluation because of Plaintiff's "urgency [in] getting an evaluation for [CPS] so that they will end the current [CPS] investigation of her care of her infant." (Tr. 242.)  Yet Plaintiff missed follow-up appointments over the next three months, and in May 2007, Northeast Guidance Center terminated services because Plaintiff was noncompliant with treatment. (Tr. 232.) Similarly, in September 2007, Plaintiff sought treatment at the University Psychiatric Centers/PBMP, and "admitted that part of her reasoning of getting help now is to show the court that she is working toward improving her mental health." (Tr. 261.)  Yet she failed to follow up on Dr. Sidhu's therapy referrals while nonetheless demonstrating the capacity to seek medication refills.  (Tr. 311.) Similarly, in February and April 2009, Plaintiff regularly attended her therapy, but the summary provides that Plaintiff had a May 4, 2009 court date.  (Tr. 313.)[7] The Court further notes that when Plaintiff felt depressed after the births of her fourth, fifth, and seventh children, she was capable of seeking medical treatment.  (Tr. 260, 267, 275.)  Moreover, at least three different evaluators (in three different years) assigned Plaintiff a moderate GAF score of 60 or above.  (Tr. 262 (Drs. Balon and Sidhu in 2007), Tr. 361 (Lavigne in 2008), Tr. 309 (Dr. Harris in 2009).)  And Plaintiff's bipolar disorder was often diagnosed as "Moderate" or "Mild."  (Tr. 262, 268, 361).  The foregoing weighs against Plaintiff's explanation that her bipolar symptoms were so severe that it caused her to miss her therapy treatments on multiple occasions. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476

---

[7]As discussed below, the Court does not find this pattern of conduct as supportive of the ALJ's inference as the Commissioner.  For example, in 2009, Plaintiff complied with therapy for several months prior to a court hearing.  This may be consistent with the ALJ's inference.  But in late 2005, Plaintiff missed all of her therapy sessions immediately following a psychiatric evaluation done in view of a CPS investigation.  This was hardly a good way to convince CPS that Plaintiff was compliant with treatment such that she should get her children back.  And if Plaintiff believed, as the ALJ suggests, that her minimal compliance on either occasion would appease the custody court or CPS, that belief is somewhat irrational and undermines the ALJ's inference.

21

(6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.").[8]

It remains, however, whether Plaintiff's testimony has been discounted in compliance with the social security rulings. SSR 96-7p, which the ALJ relied upon as the basis for drawing an adverse inference against Plaintiff for missing therapy sessions, provides that ALJ's have an obligation to consider, and, in some cases, solicit, a claimant's explanation for failing to follow a treatment plan:

> [An] individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed *and there are no good reasons for this failure*. However, the adjudicator *must not* draw *any* inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide*, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to *recontact the individual or question the individual at the administrative proceeding* in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

SSR 96-7p, 1996 WL 374186 at *7 (emphases added). In addition, the Sixth Circuit has suggested that an ALJ should proceed with caution in drawing the adverse inference where the Plaintiff suffers

---

[8]The Court notes that the justification underlying deference to the ALJ's credibility determination applies with less force in this case, however. The ALJ largely based his credibility determination on the fact that Plaintiff did not comply with her scheduled mental-health treatment—this was not grounded in the Plaintiff's "demeanor while testifying" but upon the administrative record. This Court is situated similarly to the ALJ in its ability to interpret documents in the administrative record.

from a mental impairment. *See Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir.1989) (noting that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation" and that failure to seek medical care "should not be a determinative factor in a credibility assessment" where claimant is operating under a mental impairment).

In this case, Plaintiff suffers from a mental impairment and was unrepresented at the hearing. There, the ALJ did not suggest that one of the major reasons he would later find her testimony incredible was because of her spotty treatment record. She therefore did not have an opportunity to provide an explanation for missing her treatments, and nothing suggests that the ALJ subsequently elicited any explanation from Plaintiff. *See* SSR 96-7p, 1996 WL 374186 at *7; *cf. Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (noting that "under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures," an ALJ has "a special, heightened duty to develop the record").

Moreover, the Court cannot readily determine that this procedural flaw was harmless. As discussed immediately below, there is significant evidence supporting the notion that Plaintiff's bipolar disorder may have been at least partially responsible for her missed therapy treatments. If this causal connection is believed, not only would it tend to negate the ALJ's adverse inference, it would create an inference favorable to Plaintiff: it would support her claim that her bipolar disorder is more severe than acknowledged by the ALJ, and, perhaps result in a more restrictive hypothetical or RFC assessment.

Plaintiff has been diagnosed many times over with bipolar disorder. (Tr. 262, 268, 287, 291,

361; *see also* Tr. 279 (major depressive disorder), Tr. 346 (depression and anxiety)).  She has gone

to the hospital for symptoms related to this condition on at least four occasions—three times with

suicidal thoughts.  (Tr. 207, 268, 276, 330.)  Dr. Hasan's February 2008 evaluation—on behalf of

the state DDS—suggests poor judgment, and he diagnosed Plaintiff with "Bipolar I Disorder,

Mixed . . . with psychotic features" with a GAF of 45.   (Tr. 287.)[9]  The ALJ did not discuss Dr.

Hasan's opinion.  Plaintiff has stated that she has wandered the streets at night with the devil on her

mind, and an unnamed clinician found that the voices Plaintiff hears might be attributable (at least

in part) to psychosis.  (Tr. 260, 285, 311.)  Plaintiff has exhibited what appears to be risk-seeking

behavior by conceiving nine children with at least four different men.  *See DSM-IV* at 358-59

(explaining that "[a]dverse consequences of a manic episode often result from poor judgment" and

that "[e]xpansiveness, unwarranted optimism, grandiosity, and poor judgment often lead to an

imprudent involvement in pleasure activities such as . . . sexual behavior unusual for the person . .

. .  Unusual sexual behavior may include infidelity or indiscriminate sexual encounters with

strangers.").

Indeed, Drs. Balon and Sidhu found that Plaintiff's judgment was "poor," and further stated,

Plaintiff "became pregnant in late adolescence and began a pattern of relationships with men in

which she begins relationships that are primarily sexual in nature, culminate in pregnancy, and end

quickly after."  (Tr. 262.)  Over a 15-year span, Child Protective Services has determined that

---

[9]The DSM provides that Bipolar I Disorder "is a clinical course that is characterized by the occurrence of one or more Manic Episodes . . . or Mixed Episodes."  *DSM-IV* at 382.  "A Mixed Episode is characterized by a period of time (lasting at least 1 week) in which the criteria are met both for a Manic Episode and for a Major Depressive Episode nearly every day."  *DSM-IV* at 362. "By definition, the presence of psychotic features during a Manic Episode constitutes marked impairment in functioning."  *DSM-IV* at 358.

Plaintiff cannot adequately care for her children, with her most recent two children, born a month before the administrative hearing, "taken from her care right from the hospital." (*See* Tr. 26-27, 191, 261, 275.) Plaintiff has, on more than one occasion, expressed her desire to obtain custody over her kids (Tr. 33, 242, 287), and that thought, coupled with a failure to comply with a treatment plan to regain custody, suggests irrational behavior. For the entirety of her adult life, Plaintiff has held only one job of any significance—it lasted for eight months. In fact, the ALJ found that Plaintiff had no past relevant work experience and that Plaintiff has never engaged in substantial gainful employment. (*See* Tr. 16, 24, 37.)

In total, these facts give the Court pause and reason to proceed with caution. The Court declines to speculate that upon remand, an altered credibility assessment will make no difference in the ALJ's RFC assessment. Accordingly, the Court recommends remand to the ALJ for further factual development regarding the reason for Plaintiff's missed treatments, *see* SSR 96-7p, and whether the severity of her bipolar disorder requires an alteration to the ALJ's RFC assessment.[10]

### 3. Plaintiff's Claim That the ALJ's Hypothetical Was Inaccurate is Moot

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Plaintiff's third argument is that the ALJ's hypothetical to the VE was inaccurate because it failed to account for a factual finding the ALJ made

---

[10]The ALJ drew a second, problematic adverse inference from Plaintiff's work history: "[a] review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." (Tr. 16.) This is a *non sequitur*. Plaintiff has alleged disability since March 1, 1990 (Tr. 10); she turned 15 years old on that date.

at step two: that Plaintiff has a moderate limitation in concentration, persistence, or pace. (Pl.'s Mot. Summ. J. at 19; Tr. 13.) This argument is moot since the ALJ's reevaluation of Plaintiff's credibility on remand may alter the ALJ's RFC; in particular, the ALJ may (and the Court does not suggest that he should or should not) decide to include a concentration or pace limitation after reconsidering the weight accorded to Plaintiff's testimony.

Nonetheless, this Court takes the opportunity to note that Plaintiff has placed undue reliance on Dr. Yousuf's opinion by asserting that it demands inclusion of a concentration limitation in the ALJ's hypothetical or RFC. (Pl.'s Mot. Summ. J. at 19.) The argument that hypothetical limitations such as "simple," "routine," and "unskilled" fail to account for moderate concentrational deficiencies is not novel, and cases from this District have resolved the issue both ways.[11]  In

---

[11]*Compare Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007) ("Here, the ALJ found that although Plaintiff has a moderate deficiency in her ability to maintain concentration, persistence, and pace, she is able to perform simple, routine, repetitive work. However, the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations."); *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009) ("In the present case, while finding that Plaintiff is 'moderately limited with concentration, persistence, and pace,' [the ALJ's] only limitations were with co-workers and the public, and to 'unskilled, light jobs.' These parameters are not sufficient, and do not fully convey Plaintiff's limitations in concentration to the VE. Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at an unskilled job." (internal citations omitted)); *Long v. Comm'r of Soc. Sec.*, No. 09-14227, 2010 WL 6413317, at *7 (E.D. Mich. Dec. 6, 2010) ("In the present case, the ALJ gave Plaintiff the mental limitation for 'simple unskilled work.' However, the ALJ also determined that 'with regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties.' The ALJ did not incorporate [that] limitation . . . into the controlling hypothetical. This was error." (internal citations omitted)) *with Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of 'moderate' limitations . . . are not incompatible."); *Latare v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. April 20, 2009) ("The Law Judge's hypothetical questions to the Vocational Expert accurately described Plaintiff's

26

analyzing this case law, the Court agrees that a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace because the difficulty of a task does not always equate with the difficulty of staying on task. *See e.g.*, *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005).

However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of "unskilled work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision:

> Taken in isolation, the hypothetical limitations consisting of "[s]imple routine tasks in a low stress environment" and "minimal changes in the work place setting" might appear inadequate to account for "moderate" concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible.

*Hess v. Comm'r of Soc. Sec.*, No. 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008); *see also Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) ("There may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. Plaintiff does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate

---

moderate limitations caused by her depressive disorder. There is no merit to Plaintiff's argument that the ALJ should have included a limitation that she had moderate limitations in maintaining concentration, persistence or pace. Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any, judgment."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

limitations in concentration, persistence, or pace.").

Here, Plaintiff relies on the PRT form (and, presumably, the MRFC form) completed by Dr. Yousuf indicating that Plaintiff has moderate limitations and difficulties in social functioning and maintaining concentration, persistence, and pace. (Tr. 298, 303.) The ALJ adequately accounted for the former limitation in his hypothetical (and RFC assessment) by restricting Plaintiff to "incidental" contact with the public. (Tr. 13, 40.) Regarding the latter limitation, it is critical to note that while Dr. Yousuf marked check-boxes indicating moderate concentration and pace difficulties, the accompanying narrative provides that "evidence in [the claimant's] file indicates that the claimant retains the mental capacity to understand, remember, maintain concentration [and] pace, get along with others, [and] respond to change in order to complete simple unskilled tasks on a sustained basis." (Tr. 304.) To the extent Plaintiff asserts that the ALJ erred in excluding the parts of Dr. Yousuf's opinion that favor disability, Plaintiff ignores Dr. Yousuf's conclusion that *despite* Plaintiff's concentration limitations, she can "complete simple unskilled tasks on a sustained basis." (Tr. 304.) Because Plaintiff must "take the good with the bad," the Court rejects Plaintiff's third point of error. *See Hess*, 2008 WL 2478325, at *8 ("Plaintiff's argument for the selective adoption of [the state DDS examiner's] 'moderate' limitations without considering his ultimate conclusion would amount to a distortion of the record.").

### 4. The ALJ's Failure to Inform Plaintiff that She Had a Right to Cross Examine the Vocational Expert Was Not Harmless

Lastly, Plaintiff asserts that the ALJ failed to adequately develop the record because he did not ask her whether she had any questions for the VE. (Pl.'s Mot. Summ. J. at 20.) As noted above, "under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures," an ALJ has "a special, heightened duty

28

to develop the record." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).   However, "the determination of whether an ALJ has failed fully to develop the record in derogation of this heightened responsibility must be determined on a case-by-case basis, and that it is clear that a claimant may waive his right to counsel." *Id.*

The ALJ's failure to ask Plaintiff if she had any questions for the VE is likely moot given this Court's recommendation to remand.[12]  To the extent that it is not, the Court finds that the ALJ's failure to ask Plaintiff if she had any questions for the VE supports this Court's conclusion that this case requires further factual development.  Although Plaintiff had an initial hearing informing her of her right to counsel, and she knowingly waived that right, she was ultimately unrepresented at the hearing.  (Tr. 20, 45-52.)  And while the ALJ asked Plaintiff, following his examination of the VE, if she had "anything further [she] want[ed] to bring out at the hearing," this statement did not inform Plaintiff that she had the right to question the VE. *See English v. Astrue*, No. 1:09-CV-00298, 2010 WL 424971, at *4 (N.D. Ohio Jan. 27, 2010) (remanding where ALJ failed to inquire of the unrepresented claimant "whether there was anything in the vocational expert's testimony that was unclear to her and/or whether she had any questions she wished to ask the [VE]").  While "[i]t is impossible to prove, at this point, what questions [Plaintiff] may have posed to the vocational expert if given the opportunity, . . . it is not a stretch say that she may have asked some common sense

---

[12]In order to determine why Plaintiff was non-compliant with her mental health treatment, the Court presumes that the ALJ will seek additional testimony from Plaintiff upon remand, and, therefore, hold another hearing.  To the extent that VE testimony is elicited, Plaintiff would have an opportunity to cross-examine the VE on remand irrespective of whether it was error for the ALJ to inform Plaintiff of this opportunity at the prior hearing.

questions pertaining to how she could be expected to do the jobs identified by the vocational expert given her [mental and] emotional health." *Id.*  Accordingly, the Court concludes that the ALJ's failure to inform an unrepresented Plaintiff (who suffers from a mental impairment) that she had the right to question the VE, was not necessarily harmless and further supports the need for additional factual development in this case.

### G.  Conclusion

For the foregoing reasons, this Court finds that the administrative record requires further development as to the severity of Plaintiff's bipolar disorder; specifically, whether an explanation exists that negates the adverse inference the ALJ used in discounting Plaintiff's assertions of a disabling mental impairment.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served

upon this magistrate judge. E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: June 8, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 8, 2011.

s/Jane Johnson
Deputy Clerk

31